IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SECURITIES AND EXCHANGE ) <br> COMMISSION ) <br> ) <br>       Plaintiff, ) <br> ) <br>       v. ) <br> ) <br> RAYMOND MARKER and ) <br> UNITED STATES PRIVATE ) <br> INVESTMENT FUND ) <br> ) <br>       Defendants. ) <br> _____ ) | 1:02CV01109 |

MEMORANDUM ORDER

Tilley, Chief Judge

For the reasons set forth in this order, Fred T. Hamlet's motion to modify the subpoena he received in connection with his representation of Raymond M. Marker and the United States Private Investment Fund [Doc. # 42] is GRANTED.

I.

On December 20, 2002, the Securities and Exchange Commission ("Commission") filed a civil suit against Raymond M. Marker and the United States Private Investment Fund ("USPIF"), alleging several violations of federal securities laws. The Clerk of Court entered an Entry of Default in this case on June 19, 2003 [Doc. # 30].[1] On September 30, 2003, the Court appointed a Receiver for

---

[1] On June 16, 2004, Mr. Marker was convicted of 17 counts of securities fraud, money laundering, mail and wire fraud. See United States v. Marker, No. 1:04CR10-1 (M.D.N.C. June 16, 2004). Mr. Marker was sentenced to 110 months of imprisonment and ordered to pay $4,645,679 in restitution on October

the estate of Raymond M. Marker and USPIF [Doc. # 37].[2] Because Mr. Marker had commingled funds between USPIF and a number of other corporate entities, the Receivership Estate was defined to consist of "the assets of Marker and USPIF and the assets of any other entity owned or controlled by Marker or USPIF."[3] (Ord. App. Receiver ¶ 1.)

The context in which the Receiver was appointed is worth emphasizing. When the Commission initially filed suit against Mr. Marker and USPIF, a Consent Order was issued [Doc. # 6]. Among other things, the Order prohibited Mr. Marker from removing or destroying any documents or other items relating to his business pending a hearing on January 8, 2003 on the Commission's Motion for a Temporary Restraining Order [Doc. # 2]. However, despite the Order, Mr. Marker proceeded to remove a file cabinet, a large box of undisclosed materials, and a number of pieces of art from his offices during the week of December 30, 2002. (See Mem. Supp. Emergency App., Exs. 1-4.) The court therefore issued an Order granting the Commission's Emergency Motion to Freeze Assets and for an Accounting [Doc. #s 7 & 11]. This Order required Mr. Marker and USPIF to

---

21, 2004. See id.

[2] Thomas W. Waldrep, Jr. was originally appointed as Receiver for the Estate. Mr. Waldrep was replaced as Receiver by Elizabeth M. Repetti in an Order dated May 21, 2004 [Doc. # 49].

[3] Mr. Marker described himself as the "authorized director" of USPIF. (Amend. Compl. ¶ 4.)

2

provide an accounting of (1) all assets, including documents, that had been removed from their offices, (2) all investor funds that they had raised pursuant to their sale of securities and (3) the disposition and use of these investor funds.[4] However, Mr. Marker and USPIF failed to provide the required accounting and failed to appear at the January 8, 2003 hearing on the Commission's Motion for a Temporary Restraining Order. Mr. Marker also failed to file an Answer in this case and, having removed virtually everything from his offices, fled the jurisdiction.

The Receivership Estate was created in order to aid in the recovery of the proceeds from the fraud committed by Mr. Marker and USPIF. (Mem. Supp. Mot. App. Receiver 2-3.) These assets are to be used to compensate Mr. Marker and USPIF's aggrieved investors. (Id.) The Receiver faces considerable obstacles in accomplishing this task. Mr. Marker destroyed or removed many of the documents relating to his investment scheme and transferred most of the funds raised through the scheme to offshore bank accounts. Therefore, under the Appointment Order, the Receiver was given all powers and rights necessary to efficiently administer and manage the Receivership Estate. (Ord. App. Receiver ¶ 2.) Among these powers was the power to "compel, including by subpoena . . . the production of

---

[4] In its Emergency Motion to Freeze Assets and for an Accounting, the Commission noted that $1.6 million of the monies that Mr. Marker and USPIF raised through their fraudulent securities offerings was transferred to bank accounts in Panama, Austria, Latvia, Guatemala, Romania, and the Czech Republic. (Mem. Supp. Emergency App., Decl. of Katharyn W. Weeks, Ex. 1, RBC-Centura Bank Suspicious Activity Report.)

3

the originals of any records, of any sort whatsoever, within the possession, custody or control of any person . . ." (Id. ¶ 10.) However, the Order specifically noted that this power "shall not be construed to require the waiver by any person of any validly asserted privilege." (Id.)

On April 9, 2004, attorney Fred T. Hamlet filed a motion objecting to a subpoena served upon him by the Receiver [Doc. # 42]. Mr. Hamlet, an attorney, represented Mr. Marker, USPIF and several other Marker-related entities in six separate civil cases.[5] The subpoena was the result of an informal request made by the Receiver to Mr. Hamlet in a letter dated March 9, 2004 for any files connected to this representation. (Mem. Supp. Third Party Obj., Ex. A.) In her letter, the Receiver asserted that she controlled any attorney-client privilege between (1) Mr. Hamlet and Mr. Marker and (2) Mr. Hamlet and any Marker-related entity. (Id.) In response to the Receiver's request, Mr. Hamlet requested an ethics advisory opinion from the North Carolina State Bar as to whether a duty of confidentiality to his former clients prohibited him from disclosing this information without their consent. (Mem. Supp. Third Party Obj., Exs. B & C.) The State Bar declined to issue an ethics advisory opinion and the Receiver caused a subpoena to be issued to Mr. Hamlet, seeking all documents "that relate in any way" to Mr. Marker,

---

[5] Mr. Hamlet represented Mr. Marker individually in all six of these cases. In five of the cases, he also represented either USPIF or another Marker-related corporate entity. And in one of the cases, he represented an employee of a Marker-related entity, Robert R. Young. (Mem. Supp. Third Party Obj., Ex. F.)

4

USPIF and 24 other listed entities. (Mem. Supp. Third Party Obj., Ex. E.)

Mr. Hamlet responded to the subpoena by providing the Receiver with several non-confidential documents and by moving for a protective order [Doc. # 42]. In his Motion for a Protective Order, Mr. Hamlet contends that (1) any documents relating to his representation of Mr. Marker and USPIF are protected by the attorney-client privilege, (2) the Receiver does not control Mr. Marker's individual attorney-client privilege, and (3) although the Receiver may control the attorney-client privilege for USPIF and any other Marker-related corporate entity, the joint defense privilege, or common interest rule, prohibits her from waiving this privilege without Mr. Marker's consent.

## II.

The attorney-client privilege is the oldest of the common law privileges concerning confidential communications. Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). "The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." Id. Thus, by encouraging full and frank communication between attorneys and their clients, the privilege promotes the broader public interest in the observance of law and the administration of justice. Id. Generally, the attorney-client privilege protects a client's confidential

5

communications with his attorney concerning legal advice.[6]  United States v. Tedder, 801 F.2d 1437, 1441 (4th Cir. 1986) (citation omitted).  The burden rests with the proponent of the attorney-client privilege to establish its applicability.  In re Grand Jury Subpoenas: Under Seal, 415 F.3d 333, 338-39 (4th Cir. 2005) (citation omitted).   However, because the attorney-client privilege interferes with "the truth seeking mission of the legal process," it should be narrowly construed.  Tedder, 801 F.2d at 1441.  Therefore, the privilege "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege."  Fisher v. United States, 425 U.S. 391, 403 (1976).  The attorney-client privilege can be invoked by both individuals and corporations.  See Upjohn Co., 449 U.S. 383 (1981).

In Commodity Futures Trading Commission v. Weintraub, 471 U.S. 343 (1985), the Supreme Court considered the issue of whether the trustee of a corporation in bankruptcy has the power to waive a debtor corporation's attorney-client privilege with respect to communications that took place before the filing of

---

[6] The attorney-client privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate, and (b) is acting as a lawyer in connection with the communication; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.  In re Grand Jury Subpoena: Under Seal, 415 F.3d 333, 338 n.3 (4th Cir. 2005) (citing United States v. Jones, 696 F.2d 1069, 1072 (4th Cir. 1982)).

6

the bankruptcy petition. The Court held that "[b]ecause the attorney-client privilege is controlled, outside of bankruptcy, by a corporation's management, the actor whose duties most resemble those of management should control the privilege in bankruptcy, unless such a result interferes with policies underlying the bankruptcy laws." Id. at 351-52. Because the bankruptcy trustee exercises wide-ranging management authority over the debtor corporation, the Court concluded that the trustee "plays the role most closely analogous to that of a solvent corporation's management." Id. at 353. The Court also noted that "[w]ithout control over the privilege, the trustee might not be able to discover hidden assets or looting schemes . . . ." Id. at 354. Thus, by vesting control of the privilege in the trustee, the goals of the bankruptcy code are furthered because the trustee is better able to investigate fraudulent conduct on the part of prior management and thereby maximize the value of the bankruptcy estate. Id.

The rationale underlying the holding in Weintraub has been applied to cases involving receiverships. In S.E.C. v. Elfindepan, 169 F. Supp. 2d 420, 430 (M.D.N.C. 2001), the court relied on Weintraub in holding that the receiver was the actor most analogous to management in the companies at issue and therefore succeeded to their attorney-client privilege. The court noted that, just as in the bankruptcy setting, the receiver would encounter difficulty in discovering hidden assets and other potential schemes without succession to the attorney-client privilege. Id. at 431. Similarly, in Odmark v. Westside Bancorporation, Inc., 636

7

F. Supp. 552, 554 (W.D. Wash. 1986), the court held that because the receiver succeeded to the rights and powers of the company and its management, he also succeeded to the attorney-client privilege which existed between the corporation and its former counsel.

### A.

In this case, the Receiver contends that because she "stands in the shoes of the entity for which [s]he has been appointed," she controls the attorney-client privilege of both Mr. Marker and USPIF. (Mem. Supp. Resp. to Third Party Obj. 4.) In particular, she argues that, as the Receiver, she is entitled to waive any attorney-client privilege that exists between Mr. Marker and Mr. Hamlet. However, none of the cases cited by the Receiver support such a broad reading of her powers.

The Receiver first argues that the rationales underlying the holdings in Weintraub and Elfindepan support a finding that she controls Mr. Marker's individual attorney-client privilege. However, both of these cases addressed only the issue of whether a trustee or receiver succeeded to the attorney-client privilege of a corporation.[7] In addition, none of the cases cited by the Receiver interpret

---

[7] In fact, the Weintraub Court specifically noted that "our holding today has no bearing on the problem of individual bankruptcy, which we have no reason to address in this case." 471 U.S. at 356; see also Elfindepan, 169 F. Supp. 2d at 430 n.9 ("The subpoena at issue only requests information pertaining to [the corporation] and does not seek any information that is personal to [the defendant]."). The Weintraub Court also observed that an individual acts for himself and not through management and therefore, if control over an individual's attorney-client privilege was to pass to a trustee, it must be under a different

8

Case 1:02-cv-01109-NCT   Document 58   Filed 02/06/06   Page 8 of 15

Weintraub to mean that the trustee in bankruptcy has a broad power to waive an individual's attorney-client privilege.[8]  Nonetheless, the Receiver points to the fact that both the Weintraub and Elfindepan courts remarked upon the difficulty a trustee or receiver would face in recovering assets if not allowed to succeed to the privilege.  She argues that these concerns are equally applicable to this case and therefore justify a finding that she succeeds to Mr. Marker's individual attorney-client privilege.  (Mem. Supp. Resp. to Third Party Obj. 6.)

There is no doubt that access to Mr. Marker's individual attorney-client privilege could aid the Receiver significantly in uncovering hidden assets and carrying out her other duties.  However, this does not end the inquiry.  Several courts, when confronted with a trustee's request to waive the attorney-client privilege of an individual debtor, have adopted a balancing approach: weighing the

---

theory than the one underlying the decision in Weintraub.  Id. at 356-57.

[8] See In re Bame, 251 B.R. 367, 375 (Bankr. D.Minn. 2000) (holding that trustee succeeded to privilege regarding only those communications relating to estate administration and that took place while debtor was a debtor in possession); In re Williams, 152 B.R. 123, 129-30 (Bankr. N.D. Tex. 1992) (holding that trustee had power to waive privilege of an individual debtor under limited facts of case (where trustee sought to pursue avoidance causes of action) and noting that no harm could come to the individual debtor); In re Smith, 24 B.R. 3 (Bankr. S.D. Fla. 1982) (debtor could not assert attorney-client privilege in narrow situation where he was questioned by trustee regarding existence of cause of action against insurer for wrongful failure to settle wrongful death suit or against attorneys for malpractice where judgment in wrongful death suit caused debtor to file for bankruptcy); In re Eddy, 304 B.R. 591 (Bankr. R. Mass. 2004) (trustee could waive individual debtor's attorney-client privilege in matters regarding property and administration of bankruptcy estate but could not waive privilege as to any communications that took place before debtor became a debtor in possession).

9

potential for harm to the individual debtor with the trustee's duty to maximize the value of the debtor's estate.[9] See Foster v. Hill (In re Hill), 188 F.3d 1259, 1268 (10th Cir. 1999) (holding that determination of trustee's control over privilege should be based upon a comparison of the harm to the debtor against the trustee's need for information).

In the present case, Mr. Marker is currently serving a sentence of one hundred and ten months in federal prison as a result of criminal convictions for securities, mail and wire fraud. It is very likely that Mr. Hamlet's files could contain information that would expose Mr. Marker to additional criminal charges. Therefore, after balancing the risk of harm to Mr. Marker against the Receiver's need for information, it is clear that this balancing test does not favor a finding that the Receiver controls Mr. Marker's individual attorney-client privilege. Thus, Mr. Hamlet does not have to disclose any confidential communications relating to his individual representation of Mr. Marker to the Receiver.

---

[9] In cases where courts found that a trustee does not have the power to waive the attorney-client privilege of the individual, the court focused on the potential for personal harm to the debtor and the risk of chilling attorney-client communication. See, e.g., In re Silvio, 27 B.R. 28 (Bankr. S.D. Fla. 1982) (where an individual who owned all the stock of bankrupt corporation also filed for bankruptcy, trustee could waive privilege of corporation because only fiscal loss of assets could arise, but could not waive for the individual because disclosure could involve criminal conduct). Courts that found that the trustee may waive the privilege of an individual debtor focused on the absence of any adverse effects on the debtor. See, e.g., In re Bazemore, 216 B.R. 1020, 1024-25 (Bankr. S.D. Ga. 1998) (holding that trustee may waive privilege where no harm would come to individual debtors and where waiver would not have chilling effect on attorney-client relationship).

10

**B.**

Based on the holdings in <u>Weintraub</u> and <u>Elfindepan</u>, it is clear that the Receiver succeeds to the attorney-client privilege of USPIF and any other corporate entity created by Mr. Marker (collectively, "USPIF").[10] Nonetheless, Mr. Hamlet contends that the Receiver is not entitled to any communications relating to Mr. Hamlet's joint representation of Mr. Marker and USPIF. (Mem. Supp. Third Party Obj. 4.) In support of this argument, Mr. Hamlet points to <u>In re Grand Jury Subpoenas</u>, 902 F.2d 244, 248-50 (4th Cir. 1990). In this case, the Fourth Circuit held that when litigants share a common interest in litigation, all communications related to that litigation are privileged. Under this so-called "common interest rule" or "joint defense privilege," the attorney-client "privilege cannot be waived without the consent of all the parties who share the privilege." <u>Id.</u> at 248 (citation omitted). Mr. Hamlet contends that because he represented Mr. Marker and USPIF jointly in five civil cases, a joint defense privilege exists between Mr. Marker and USPIF as to all communications relating to Mr. Hamlet's representation.[11]

---

[10] A number of the cases in which Mr. Hamlet defended Mr. Marker involve a Marker-related corporate entity other than USPIF. (<u>See</u> Mem. Supp. Third Party Obj., Ex. F.) However, because Mr. Marker frequently used his corporate entities interchangeably and because the Receivership Estate controls USPIF and any other Marker-related corporate entity, the Court will refer to these corporate entities collectively as USPIF for the sake of simplicity.

[11] As mentioned previously, Mr. Hamlet represented Mr. Marker individually in six civil cases. However, in five of these cases Mr. Hamlet also represented either USPIF or another Marker-related corporate entity. Therefore, the joint defense privilege only applies to these five cases. (Mem. Supp. Third Party Obj., Ex. F.)

11

The common interest rule, or joint defense privilege, protects communications between parties who share a common interest in litigation. In re Grand Jury Subpoena: Under Seal, 415 F.3d at 341. The purpose of the common interest rule is to allow "persons with a common interest to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims." Id. The common interest rule has been interpreted to apply in a broad range of circumstances, including both civil and criminal cases. See In re Grand Jury Subpoenas, 902 F.2d at 249 ("Whether an action is ongoing or contemplated, whether the jointly interested persons are defendants or plaintiffs, whether the jointly interested persons are defendants or plaintiffs, and whether the litigation or potential litigation is civil or criminal, the rationale for the joint defense rule remains unchanged . . . ."). For the common interest rule to apply, "the proponent must establish that the parties had some common interest about a legal matter." In re Grand Jury Subpoena: Under Seal, 415 F.3d at 341(citing Sheet Metal Workers Int'l Assoc. v. Sweeney, 29 F.3d 120, 124 (4th Cir. 1994)). "The privilege arises out of a need for a common defense, as opposed to merely a common problem." Baltimore Scrap Corp. v. David J. Joseph Co., 1996 WL 720785 at *8 (D.Md. 1996) (citing Medcom Holding Co. v. Baxter Travenal Labs., 689 F. Supp. 841, 845 (N.D.Ill. 1988)).

Mr. Marker and USPIF were sued jointly on five separate occasions by aggrieved investors. (See Mem. Supp. Third Party Obj., Ex. F.) Given that these

12

suits were a result of the activities carried out by Mr. Marker and USPIF, there is no doubt that the two parties shared a common legal interest in defending these civil cases.[12] Therefore, the common interest rule, or joint defense privilege, prevents Mr. Hamlet from disclosing any confidential communications related to his joint representation of Mr. Marker and USPIF to the Receiver. See In re Grand Jury Subpoenas, 902 F.2d at 249-50 (holding that documents generated during joint prosecution of claim and joint defense of counterclaim were subject to joint defense privilege).

Nevertheless, the Receiver contends that In the Matter of Bevill, Bressler & Schulman Asset Mgmt. Corp., 805 F.2d 120, 123 (3d Cir. 1986) should govern the analysis in this case.[13] In Bevill, the Third Circuit upheld the district court's

---

[12] Although this issue has not been briefed, it is worth noting that USPIF was essentially the alter ego of Mr. Marker. Mr. Marker created USPIF as a vehicle for his scheme to defraud investors. (See generally Amend. Compl.) In addition, not only did he frequently withdraw funds from USPIF bank accounts for his own purposes, he commingled funds between USPIF and several other corporate entities that he also created. See DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681 (4th Cir. 1976) (holding that corporation was the alter ego of corporate officer when there was a complete disregard for corporate formalities, corporation was undercapitalized, and corporate officer withdrew funds from corporation for personal purposes). Thus, not only did Mr. Marker and USPIF share a common legal interest in defending the six civil cases, their interests were virtually identical. See Baltimore Scrap Corp., 1996 WL 720785 at *8 (noting that co-defendants may not necessarily share an identical interest in defending against an accusation and thus the common interest rule may not always apply).

[13] The Receiver also contends that Elfindepan is directly on point in this case. (Mem. Supp. Resp. to Third Party Obj. 9) However, as discussed above, Elfindepan only addressed the question of whether a receiver succeeded to the attorney-client privilege of a corporation. 169 F. Supp. 2d at 430. In fact, the court specifically noted that the subpoena at issue did not seek any information

13

decision that a corporate officer must satisfy a five factor test in order to assert a personal claim of attorney-client privilege as to communications with corporate counsel.  However, the Bevill court specifically recognized that the existence of a joint defense privilege was a separate issue from the issue of whether a corporate officer could assert his individual attorney-client privilege to prevent a corporation from disclosing communications with corporate counsel.  805 F.2d at 126; see also In re Grand Jury Proceedings, 156 F.3d 1038, 1043 (10th Cir. 1998) (considering applicability of joint defense privilege separately from issue of whether hospital executive could prevent hospital from releasing documents based on individual attorney-client privilege).

In this case, Mr. Hamlet does not deny that Mr. Marker approached him for individual legal advice.  (Reply 8.)  And he does not claim that Mr. Marker's individual attorney-client privilege prevents USPIF from waiving its privilege.  Rather, he asserts that he defended Mr. Marker and USPIF jointly in five civil cases and thus is prevented by the common interest rule from disclosing the communications that resulted from this joint representation.  Therefore, the five factor test announced in Bevill is not relevant to the issue of whether the joint defense privilege applies in this case.

### III.

---

that would implicate the individual defendant's attorney-client privilege.  Id. at 430 n.9. Moreover, none of the defendants asserted that the joint defense privilege applied in this case.

14

For the foregoing reasons, attorney Fred T. Hamlet's motion to modify the Receiver's subpoena [Doc. # 42] is GRANTED.

It is further ORDERED that the subpoena shall be modified to exclude all confidential individual attorney-client communications between Mr. Hamlet and Mr. Marker as well as any confidential attorney-client communications arising from Mr. Hamlet's joint representation of Mr. Marker and USPIF (or any other Marker-related entity).

This the day of February 6, 2006

    /s/ N. Carlton Tilley, Jr.
United States District Judge

.

15

Case 1:02-cv-01109-NCT   Document 58   Filed 02/06/06   Page 15 of 15