IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:02CV01109 |
| RAYMOND MARKER and UNITED STATES PRIVATE INVESTMENT FUND | ) ) ) ) ) | |
| Defendants. | ) ) | |

MEMORANDUM OPINION

TILLEY, Chief Judge

This case is now before the Court on the plaintiff Securities and Exchange Commission's Motion for Default Judgment [Doc. # 52]. For the reasons set forth below, the Plaintiff's motion is GRANTED.

I.

On November 16, 2004, plaintiff Securities and Exchange Commission ("the Commission") moved for an entry of default judgment pursuant to Fed. R. Civ. P. 55(b)(2) against defendants Raymond M. Marker and the United States Private Investment Fund ("USPIF") [Doc. # 52]. The Defendants have failed to file an Answer in this case and have not responded to the Commission's Motion for Default Judgment. The Clerk of Court previously entered an Entry of Default against the Defendants on June 19, 2003 [Doc. # 30]. Accordingly, "the factual

allegations of the complaint, except those relating to the amount of damages, will be taken as true." 10A Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2688; see also SEC v. Lawbaugh, 359 F. Supp. 2d 418, 422 (D.Md. 2005) ("Upon default, the well-pled allegations in the complaint as to liability are taken as true, although the allegations as to damages are not.").

A.

On December 20, 2002, the Securities and Exchange Commission ("Commission") filed a civil suit against Raymond M. Marker and USPIF, alleging several violations of federal securities laws [Doc. #s 1 & 16]. On June 16, 2004, in a separate criminal case, Mr. Marker was found guilty of 17 counts of securities fraud, money laundering, mail and wire fraud based on the same facts as those alleged in the Amended Complaint in this case. See United States v. Marker, No. 1:04CR10-1 (M.D.N.C. Oct. 21, 2004). Mr. Marker was sentenced to 110 months of imprisonment and ordered to pay $4,645,679 in restitution on October 21, 2004. Id.

The Court issued a Consent Order [Doc. # 6] in the present case on December 20, 2002, soon after the Commission filed suit against Mr. Marker and USPIF. Among other things, the Order prohibited Mr. Marker from removing or destroying any documents or other items relating to his business pending a hearing on the Commission's Motion for a Temporary Restraining Order [Doc. # 2]. However, in spite of this Order, Mr. Marker proceeded to remove a file cabinet, a

large box of documents, and a number of works of art from his offices. (See Mem. Supp. Emergency App., Exs. 1-4 [Doc. # 8].) The court therefore issued an Order granting the Commission's Emergency Motion to Freeze Assets and for an Accounting [Doc. #s 7 & 11]. This Order required Mr. Marker and USPIF to provide an accounting of (1) all assets, including documents, that had been removed from their offices, (2) all investor funds that they had raised pursuant to their sale of securities and (3) the disposition and use of these investor funds.[1] However, Mr. Marker and USPIF failed to provide the required accounting and failed to appear at the January 8, 2003 hearing on the Commission's Motion for a Temporary Restraining Order. The Defendants have also failed to file an Answer or any other responsive pleading in this case.

B.

Beginning sometime in December of 2000, Mr. Marker and USPIF offered and sold at least $4.6 million of unregistered notes, referred to as "Flexi-Time CDs" or "Founder's Shares," to at least 43 different investors.[2] See United States v.

---

[1] In its Emergency Motion to Freeze Assets and for an Accounting, the Commission noted that $1.6 million of the monies that Mr. Marker and USPIF raised through their fraudulent securities offerings was transferred to bank accounts in Panama, Austria, Latvia, Guatemala, Romania, and the Czech Republic. (Mem. Supp. Emergency App., Decl. of Katharyn W. Weeks, Ex. 1, RBC-Centura Bank Suspicious Activity Report.)

[2] At all times relevant to this case, Raymond M. Marker was a resident of Greensboro, North Carolina and USPIF was a business entity based in Orangestad, Aruba and doing business in Greensboro, North Carolina. Mr. Marker referred to himself as the "authorized director" of USPIF on the notes that USPIF issued to

3

Raymond M. Marker, No. 1:04CR10-1 (M.D.N.C. Oct. 21, 2004). These securities were offered to the general public through an Internet website, newspaper advertisements, and personal solicitation. (Amend. Compl. ¶ 12.)

The USPIF offering materials describe the Flexi-Time CDs as "time notes" and Mr. Marker orally described the CDs to potential investors as debt that was being issued by USPIF. (Amend. Compl. ¶ 16.) According to the Defendants' offering materials and website, investors were invited to submit competitive bids for the Flexi-Time CDs online. In order to bid online for the CDs, investors had to register on the website by providing their name, address, telephone number and a personal identification number. (Amend. Compl. ¶ 20.) The Flexi-Time CDs were issued in denominations of $250, $500, $1,000 or $2,500. (Amend. Compl. ¶ 17.) The bidding process for each denomination of CD began at noon on each business day and lasted for 24 hours. Potential investors started the bidding at an annual percentage rate of 9.751% and each successive bid had to be made in decrements ranging between 1/1000th to 1/10th of a percentage point. (Amend. Compl. ¶ 18.) At the close of each bidding period, the investors who bid the lowest interest rate for each of the four denominations were purportedly awarded the Flexi-Time CD for that denomination. The next 100 lowest bidders were also offered an opportunity to purchase the CD at the winning rate. (Amend. Compl. ¶

---

investors. Mr. Marker was also the signatory on at least two banks accounts held by USPIF and has signed documents for at least one of these accounts as USPIF's authorized director. (Amend. Compl. ¶¶ 8-9.)

19.)

USPIF then emailed a "Bidding Acceptance Form" to each winning bidder and the next 100 lowest bidders. In the Acceptance Form, the bidder selected the maturity of his or her purported CD among 4 choices: 12 months, 18 months, 24 months or 30 months. (Amend. Compl. ¶ 21.) The purported CD would automatically renew for one year unless the investor notified USPIF that he or she wished to redeem the CD within ten days of the maturity date. (Amend. Compl. ¶ 11.) Winning bidders submitted a completed Acceptance Form to USPIF along with a check for the face amount of the CD. They could also wire funds to a specified bank account. One version of the offering materials directs investors to send their money to a USPIF bank account. Another directs them to an account in the name of Ansbacher Management, LP. (Amend. Compl. ¶ 23.)

Different versions of USPIF's offering materials represented that the Flexi-Time CDs generated returns ranging from 6% to 12.25% per year. (Amend. Compl. ¶ 25.) The offering materials also stated that investors should "forget the stock market [and] never get caught in a down market again." (Id.) USPIF also placed an advertisement for the Flexi-Time investment program in a New Jersey newspaper sometime in November of 2002. (Amend. Compl. ¶ 24.) In all, Mr. Marker and USPIF sold at least $1 million of Flexi-Time CDs to at least three different investors. (Amend. Compl. ¶ 26.)

Mr. Marker and USPIF also offered and sold what they referred to as

5

"Founder's Shares" to the general public.[3] These shares purportedly offered a 12% annual return for three years. (Amend. Compl. ¶ 27.) After three years, investors could either redeem their Founder's Shares at face value or convert the shares into USPIF common stock at a rate of $11.00 per share. (Amend. Compl. ¶ 29.) Mr. Marker and USPIF sold at least $2.5 million in Founder's Shares to at least seven different investors. (Amend. Compl. ¶ 31.)

The Flexi-Time CDs and Founder's Shares are "securities" as that term is defined by the federal securities laws. (Amend. Compl. ¶ 13.) However, no registration statement has ever been filed, or is in effect, with the Securities and Exchange Commission with respect to these securities as is required under the federal securities laws. (Amend. Compl. ¶ 14.) Moreover, there is no exemption to the registration requirements of the federal securities laws that applies to the Flexi-Time CDs or Founder's Shares. (Amend. Compl. ¶ 15.) The defendants did not limit the offering of Flexi-Time CDs or Founder's Shares to investors in a particular state. (Amend. Compl. ¶ 35.) Nor did the offering materials attempt to limit the offering to accredited or sophisticated investors. (Id.)

In connection with the offer and sale of both the Flexi-Time CDs and the Founder's Shares, Mr. Marker and USPIF represented that the investments would be 100% insured by U.S. Treasury obligations. (Amend. Compl. ¶ 30.) They also

---

[3] Investors actually received something called a "time note" when they purchased the Founder's Shares. (Amend. Compl. ¶ 28.)

6

represented that 50% of investor funds would be used to purchase U.S. Treasury obligations and 50% would be used to trade securities or purchase property tax liens. (Id.) In addition, Mr. Marker hired a website designer to design USPIF's website. He told the designer to include a statement on the website saying that the Flexi-Time CDs were 100% secured by U.S. Treasury obligations. (Amend. Compl. ¶ 33.) However, Mr. Marker never purchased any treasury obligations on behalf of USPIF, nor did he instruct anyone else to do so. (Amend. Compl. ¶ 34.)

II.

Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a)(1), prohibits the use of interstate commerce for purposes of fraud or deceit. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder prohibit fraudulent conduct in connection with the purchase or sale of securities. These provisions generally prohibit schemes or artifices to defraud in connection with the offer, sale, or purchase of securities. The Commission must establish that a defendant acted with scienter to prove violations of § 17(a)(1) of the Securities Act, § 10(b) of the Exchange Act and Rule 10b-5. Aaron v. SEC, 446 U.S. 680, 691, 695-96 (1980). Moreover, in order to establish that these provisions were violated through misrepresentations or omissions, the Commission must show that the misrepresentations or omissions were material. Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1980). A misrepresentation or omission is material if there is "a substantial likelihood that the disclosure of the omitted fact

7

would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). In other words, a misrepresentation is material when it would have "misled a reasonable investor about the nature of the investment." I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 761 (2d Cir. 1991).

The factual allegations of the Complaint, taken as true, establish that Mr. Marker and USPIF violated the anti-fraud provisions, §§ 17(a)(1), 10(b) and Rule 10b-5, of the securities laws. In connection with the offer and sale of the Flexi-Time CDs and Founder's Shares, Mr. Marker and USPIF represented that these securities would be 100% insured by U.S. Treasury obligations. This representation most certainly misled investors about the nature and relative safety of these securities. Moreover, the Defendants acted with scienter when they made this representation because they knew that the Flexi-Time CDs and the Founder's Shares were not secured by U.S. Treasury obligations. Finally, Mr. Marker and USPIF also represented that the Flexi-Time CDs and Founder's Shares would generate returns ranging from 6% to 12.25% and 12% respectively. Misrepresentations about expected rates of return are material. SEC v. The Better Life Club of America, Inc., 995 F. Supp. 167, 177 (D.D.C. 1998), aff'd, 203 F.3d 54 (D.C. Cir. 1999); SEC v. Lauer, 864 F. Supp. 784, 788 (N.D. Ill. 1994), aff'd, 52 F.3d 667 (7th Cir. 1995).

Sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a), (c), prohibit any person, directly or indirectly, from using the mails or any other means of interstate commerce to offer or sell a security unless it is registered with the Commission or is exempt from registration. Scienter is not an element of a § 5 violation. SEC v. Softpoint, Inc., 958 F. Supp. 846, 859-60 (S.D.N.Y. 1997), aff'd, 159 F.3d 1348 (2d Cir. 1998). Once the Commission makes a prima facie case that the securities sold were not registered, the defendants bear the burden of demonstrating that they are entitled to an exemption. Busch v. Carpenter, 827 F.2d 653, 656 (10th Cir. 1987).

In the present case, no registration statement was ever filed or in effect for any of the securities sold by Mr. Marker and USPIF. The Defendants also made use of interstate commerce in connection with the offer and sale of the Flexi-Time CDs and Founder's Shares. Mr. Marker and USPIF have not attempted to demonstrate that they were entitled to an exemption from the Act's registration requirements. Thus, the allegations of the Amended Complaint, taken as true, establish that Mr. Marker and USPIF violated §§ 5(a) and (c) of the Securities Act.

### III.

The Commission asks that the Court permanently enjoin Mr. Marker and USPIF from committing any future violations of §§ 5(a), 5(c) and 17(a) of the Securities Act and § 10(b) of the Exchange Act and Rule 10b-5 thereunder. The Commission further requests that Mr. Marker and USPIF be required to disgorge

9

the $4,645,679 they received from their fraudulent offerings and pay $405,575 in prejudgment interest. Finally, the Commission asks that the Court impose a civil penalty on the Defendants in an amount that reflects the egregiousness of the fraud perpetrated by Mr. Marker and USPIF.

A.

Section 20(b) of the Securities Act and § 21(d) of the Exchange Act provide that upon a "proper showing" the Commission may obtain a permanent injunction against any person who is engaged in a violation of any of the provisions of the securities acts or regulations. 15 U.S.C. §§ 77t(b), 78u(d)(1). However, the Commission does not have to invoke the traditional equitable requirements for injunctive relief to obtain an injunction in this context. SEC v. First Am. Bank & Trust Co., 481 F.2d 673, 681-82 (1973); SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 808 (2d Cir. 1975) ("Unlike private actions, which are rooted wholly in the equity jurisdiction of the federal court, SEC suits for injunctions are creatures of statutes. Proof of irreparable injury or the inadequacy of other remedies as in the usual suit for injunction is not required."). Rather, "[a]n injunction based on the violation of securities laws is appropriate if the SEC demonstrates a reasonable and substantial likelihood that the defendant, if not enjoined, will violate securities laws in the future." SEC v. Pros Int'l, Inc., 994 F.2d 767, 769 (10th Cir. 1993); see also SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1100 (2d Cir. 1972) ("The critical question for a district court in deciding whether to issue a permanent

10

injunction in view of past violations is whether there is a reasonable likelihood that the wrong will be repeated.").

District courts consider a number of factors in determining whether there exists a reasonable likelihood that the defendant, if not enjoined, will violate securities laws in the future. SEC v. Bonastia, 614 F.2d 908, 912 (3d Cir. 1980). These factors include: (1) the seriousness of the original violation; (2) the isolated or recurrent nature of the infraction; (3) the degree of scienter involved on the part of the defendant; (4) the defendant's recognition of his unlawful conduct and the sincerity of his assurances against future violations; and (5) the likelihood that the defendant's occupation will present opportunities for future violations. SEC v. Prater, 289 F. Supp.2d 39, 49 (D.Conn. 2003) (citing SEC v. Universal Major Indus. Corp., 546 F.2d 1044, 1048 (2d Cir. 1976)). "Essentially, a court makes a prediction of the likelihood of future violations based on an assessment of the totality of the circumstances surrounding the particular defendant and the past violations that were committed." Bonastia, 614 F.2d at 912 (citing SEC v. Koracorp Indus., Inc., 575 F.2d 692, 699 (9th Cir. 1978)). Moreover, although no single factor is determinative, the degree of scienter "bears heavily" on the decision to issue an injunction. SEC v. Pros Int'l, Inc., 994 F.2d 767, 769 (10th Cir. 1993).

A permanent injunction is appropriate in this case. The seriousness of the violations committed by Mr. Marker and USPIF is obvious: the Defendants

11

defrauded 43 investors of more than $4.6 million over a two year period. See Bonastia, 614 F.2d at 913 (noting that cases involving a number of violations over an extended period of time weigh "heavily in favor of the imposition of an injunction"). Mr. Marker's conduct involved a high degree of scienter. For example, he expressly represented to potential investors that both the Flexi-Time CDs and the Founder's Shares were 100% insured by U.S. Treasury obligations. However, at no time did Mr. Marker actually purchase U.S. Treasury obligations or instruct anyone else to do so on USPIF's behalf. See Aaron v. SEC, 446 U.S. at 701 (noting that "the degree of intentional wrongdoing evident in a defendant's past misconduct" is an "important factor" in a district court's decision to issue an injunction). In addition, the Defendants have not acknowledged responsibility for their wrongful conduct and have not given any assurances that similar conduct will not reoccur in the future.[4] Finally, although Mr. Marker will be in his sixties when he is released from prison, this factor standing alone is not sufficient to show there is no reasonable likelihood that he will commit future violations of the securities laws. SEC v. Penn Central Co., 425 F. Supp. 593, 598 (E.D. Pa. 1976). Thus, the egregious nature of Mr. Marker's previous unlawful conduct supports a finding that a permanent injunction is warranted in this case.

B.

---

[4] Indeed, Mr. Marker has not responded to this case in any fashion except to remove a number of items from his offices in violation of the express terms of the Consent Order issued by this Court. (See Mem. Supp. Emergency App. [Doc. # 8])

12

The Commission also asks that the Court order the Defendants to disgorge the amounts they fraudulently obtained from investors in the Flexi-Time CDs and Founder's Notes. It is well settled that a court may order the disgorgement of profits obtained through securities fraud. SEC v. First Pac. Bancorp., 142 F.3d 1186, 1191 (9th Cir. 1998); SEC v. Patel, 61 F.3d 137, 139 (2d Cir. 1995). Disgorgement is an equitable remedy designed to prevent the unjust enrichment of the wrongdoer and to deter others from violating the federal securities laws. First Pac. Bancorp., 142 F.3d at 1191; SEC v. Wang, 944 F.2d 80, 85 (2d Cir. 1991); SEC v. First City Fin. Corp., 890 F.2d 1215, 1230 (D.C. Cir. 1989). The district court has broad discretion in deciding whether to award disgorgement and in determining the amount to be disgorged. First Jersey Secs., Inc., 101 F.3d at 1474-75; SEC v. Lorin, 76 F.3d 458, 462 (2d Cir. 1996).

In this case, Mr. Marker and USPIF received $4,645,679 in ill-gotten gains from their fraudulent offerings. See United States v. Marker, No. 1:04CR10-1 (M.D.N.C. Oct. 21, 2004). Therefore, the Court will order the Defendants to disgorge the amount of $4,645,679. This disgorgement award is equal to the amount of restitution that Mr. Marker was ordered to pay as a result of his criminal conviction. Id. The Commission has therefore recommended that the disgorgement award be reduced by any amount that Mr. Marker pays in restitution in order to avoid duplication. The Court will adopt this recommendation.

The Commission has also requested that Mr. Marker and USPIF be required

13

to pay prejudgment interest on the amount of the disgorgement award. A decision to award prejudgment interest, and at what rate, like the decision to grant disgorgement, is in the broad discretion of the district court. First Jersey Secs., Inc., 101 F.3d at 1476. Like disgorgement, an award of prejudgment interest is intended to prevent the defendant from profiting from his or her illegal conduct. SEC v. Sargent, 329 F.3d 34, 40 (1st Cir. 2003). In other words, it prevents the defendant from receiving "what amounts to an interest free loan procured as a result of illegal activity." SEC v. Moran, 944 F. Supp. 286, 295 (S.D.N.Y. 1996). In deciding whether to award prejudgment interest, the court considers the following factors: (1) the need to fully compensate the wronged party for actual damages suffered; (2) the relative fairness of an award; (3) the remedial purpose of the statute involved; and (4) other general principles deemed relevant by the court. Commercial Union Assurance Co. v. Milken, 17 F.3d 608, 613 (2d Cir. 1994). In an enforcement action brought by the Commission, "the remedial purpose of the statute takes on special importance." First Jersey Secs., Inc., 101 F.3d at 1476.

In this case, the Commission has requested that the Court order an award of $405,575 in prejudgment interest. The Commission calculated this amount by multiplying the $4,645,679 that the Defendants received from their fraudulent scheme by the applicable interest rate during the period January 1, 2003 through October 31, 2003. (Pl.'s Mot. Def. J., Ex. 3, Prejudgment Interest Report.) The Court concludes that an award of prejudgment interest against the Defendants in

14

the amount of $405,575 is appropriate. An award of prejudgment interest in this case more fully compensates the victims of Mr. Marker and USPIF's illegal conduct. It also eliminates any financial benefit that the Defendants received from violating the federal securities laws and thus promotes the remedial purposes of these statutes.

C.

Finally, the Commission requests that the Court impose civil penalties against Mr. Marker and USPIF, pursuant to § 20(d)(2) of the Securities Act, 15 U.S.C. § 77t(d)(2), and § 21(d)(3) of the Securities Exchange Act, 15 U.S.C. § 78u(d)(3). A civil penalty is intended both to punish the individual violator and to deter future violations of the securities laws. SEC v. Coates, 137 F. Supp. 2d 413, 428 (S.D.N.Y. 2001); Moran, 944 F. Supp. at 296. A civil penalty is necessary because disgorgement merely requires the return of illegal profits; it does not impose an actual economic penalty as a deterrent to violations of the securities laws. SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1,17 (D.D.C. 1998); Moran, 944 F. Supp. at 296. The amount of a civil penalty should be determined "in light of the facts and circumstances of the particular case." Kenton Capital, Ltd., 69 F. Supp. 2d at 17 (quoting 15 U.S.C. § 78u(d)(3)). The statutes set forth three tiers of penalties for a violation of securities laws, with the third tier being the most severe. See 15 U.S.C. §§ 77t(d)(2), 78u(d)(3).

In this case, the Commission requests that the Court impose a civil penalty

15

that adequately addresses the egregiousness of the fraud perpetrated by Mr. Marker and USPIF. Third tier penalties are available when the violation (1) "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and (2) "resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii). The penalty for a third-tier violation may not exceed (1) $100,000 for a natural person or $500,000 for any other person, or (2) the gross amount of the defendant's pecuniary gain, whichever is larger. 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).

Given the egregiousness of the fraud committed by Mr. Marker and USPIF, a third tier civil penalty is appropriate in this case. The Defendants' actions were both fraudulent and deceitful and resulted in losses to individual investors of over $4.6 million. Therefore, the Court will impose a civil penalty of $500,000 on Mr. Marker and USPIF. However, it is worth noting that the Court has appointed a Receiver to the estate of Raymond M. Marker and USPIF in order to facilitate the recovery of funds for the compensation of the Defendants' defrauded investors. Therefore, the Court points the Commission to 15 U.S.C. § 7246(a).[5] Section

---

[5] 15 U.S.C. 7246(a) says in pertinent part:

> If in any judicial or administrative action brought by the Commission under the securities laws . . . the Commission obtains an order requiring disgorgement against any person for a violation of such laws or the rules or regulations thereunder . . . and the Commission also obtains pursuant to such laws a civil

16

Case 1:02-cv-01109-NCT    Document 60    Filed 03/30/06    Page 16 of 17

7246(a) authorizes the Commission to move for the addition of any civil penalties to the disgorgement fund for the benefit of the victims of the securities violations.

V.

For the foregoing reasons, plaintiff Securities and Exchange Commission's Motion for Default Judgment [Doc. # 52] is GRANTED.

This the day of March 30, 2006

                                                                    /s/ N. Carlton Tilley, Jr.
                                                                    United States District Judge

---

penalty against such person, the amount of such civil penalty shall, on the motion or at the direction of the Commission, be added to and become part of the disgorgement fund for the benefit of the victims of such violation.